[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This matter concerns a dispute arising out of a commercial lease. The landlord, Koffman Associates, Ltd, a limited partnership acting by and through its general partner Mark Koffman entered into a 5 year written lease with the defendant, Panache Plus, Inc., (Panache) a Connecticut corporation acting by and through its president, Jonathan Polayes. Polayes also executed a personal guaranty of the lease [see Ex A]. The term of the lease ran from Oct 1, 1986 through Sept 30, 1991. The demised premises comprise a part of a larger commercial building which is owned by the plaintiff.
The lease provided for two types of annual rent: basic or fixed and additional or variable. The annual basic rent reserved was $164,400 payable in equal monthly installments of $13,700 to escalate annually by 7%. Additional rent consisted of a percentage the annual operating expenses and real estate taxes.
Two types of space to be delivered
It is clear from the wording of the lease that the parties intended to distinguish between the two types of space that was to be leased for purposes of establishing the rental structure: retail and storage. Retail space or as termed in the lease "floor space" was space from which the defendant was to conduct its retail business of selling household linens and related items [para 3 Ex A] and storage space dedicated exclusively to storage of goods and merchandise. [Para 1 Ex A]. The amount of basic or fixed rent was based on the size of the entire demised premises, i.e., both retail and storage space while the amount of "Additional Rent" was based only on the percentage that the retail space of the demised premises bore to the retail space available in the entire building. [see para 2 Ex A] Paragraph 1 of the lease which pertains to the "annual rental for the "demised premises" makes no reference to "floor space" when defining the dimensions of the demised CT Page 2885 premises in terms of square footage while para 2 which pertains only to "additional rent" refers to the square footage of "floor space" in defining how additional rent is to be calculated. Consequently, this leads inescapable to the conclusion that the amount of storage space was not to be a factor in determining the amount of "additional rent" to be paid. Furthermore, this conclusion is consistent with the plaintiff's theory throughout this case that basic rent could not be valued on a square foot basis as urged by the defendant in attempting to put a value on the storage space he did not receive, but rather that basic rent was a flat amount for the entire premises described in the lease. This factor becomes significant in determining the amount of any damages to which the plaintiff may be entitled.
Size of Demised Premises
Although unable to obtain an accurate measurement of the demised space until after taking occupancy, both parties had a general understanding of the defendant's size requirements. In this regard the lease provided for "3,000 square feet more or less, plus . . ." an unspecified amount of "cellar storage" to be located in the basement below. [Para 1, Ex A] Subsequent to taking occupancy and at defendant's request, the first floor of the premises was measured by plaintiff architect. The court finds that those measurements accurately indicated that the first floor consisted of 2,735 square feet exclusive of any "common areas"; that the entire building, of which the demised premises was a part, consisted of 13,060 square feet also exclusive of common areas. [R-15, Ex CC].[1]
With regard to the storage space, the lease is silent as to how much space was to be delivered. It is nevertheless clear from the document itself that the parties intended that storage space was to be included in the in the premises to be leased. Consequently, the court must rely on parol evidence to amplify the terms of the agreement not inconsistent with the intent of the parties as to the size of this space. ENGELKE v. WHEATLEY, 148 Conn. 398, 402-403
(1961).
There are two written documents which were used by the parties in the course the negotiations that tend to indicate the intent of the parties with respect to the contemplated size of the basement. Earliest in point of time was a series of notations on the face sheet of an undated draft copy of the lease. Included among them is the notation. "1500 +-", a symbol indicating `square feet' followed by the words "basement storage." [R-5, 25, 38, Ex 1] Later in point of CT Page 2886 time, but prior to the lease execution, is an architectural drawing of the proposed basement space which was commissioned by Polayes and drawn to his specifications. [R-7, 53] This drawing depicts the dimensions of the storage area to be 28 feet by 29.75 feet or 833 s/f. [Ex MM, 30, R-52, 53] The court concludes that the architectural drawing rather than the notations on the draft face sheet accurately represent the intent of the parties with respect to the contemplated size of the demised storage space. This is because it is the clearest indication, latest in point of time and is most consistent with other evidence in the record.[1]
For these reasons the court finds the parties agreed that the cellar storage space would measure approximately 900 s/f.
Occupancy
Although the lease commenced Oct 1, 1986, defendant did not take possession of the premises until late Nov. 1986 and did not begin paying rent until December, 1986. At the time the defendant took possession in Nov. the storage space in the basement was far from being completed for occupancy. However, the plaintiff offered and the defendant accepted alternate temporary space on the 2nd floor of the building for use as storage space.
Although this alternate storage space represented an inconvenience to Panache in the operation of its business, the defendant nevertheless actually or constructively occupied this alternate storage space continuously from late November, 1986 until its lease was prematurely terminated in July, 1987.[1]
The Dispute
Conflict between the parties began to erupt almost immediately after the lease was signed. Certain fit-up work was to be performed by both parties according to a schedule attached to the lease. [Schedule B, Ex A] Polayes became dissatisfied with pace of the renovations and concerned that Panache might not be able to commence business operations in time to take advantage of the Christmas retail season which began in November. Despite assurances from Koffman to the contrary the premises were not ready for occupancy by October 1st. During October, in the absence of any request by the plaintiff, Polayes personally undertook and hired others to assist him to perform some of the fit-up work which Polayes claims was the responsibility of the plaintiff pursuant to schedule B. During this same period the plaintiff also performed some work which was the responsibility of the defendant and billed Panache therefor. The plaintiff was CT Page 2887 simultaneously performing other work at the premises which was unrelated to the lease. All work pursuant to Schedule B was completed sometime in November, 1986.
Panache was delinquent in payment of rent from the beginning of the lease. Consequently, on July 15, 1987 the plaintiff terminated defendant's lease by service of a notice to quit. [R-40, Ex 15] This was followed in due course by eviction proceedings [Ex 15] which ultimately resulted in the defendant vacating the premises on March 15, 1988.
Instant law suit
Subsequently, the plaintiff instituted this five count action against the defendant corporation on the lease and against Jonathan Polayes personally on the guaranty to recover back rent, rent for the balance of the term, losses due to the damaged condition of the premises, damages for unauthorized alterations, reletting expenses, reimbursement for fit-up work performed for Panache, reasonable attorneys fees and interest.
The defendants deny any breach on their part and claim by way of special defenses and a six count counter claim that the plaintiff breached the lease but failing to deliver the agreed upon retail and storage space, failing to mitigate damages, failing to return its security deposit, representation of the retail space, unjust enrichment, fraud in the inducement, damages for deprivation of its electrical service and attorney's fees.
The plaintiff denied all defendants counter claims and by way of special defense claims the doctrine of estoppel, waiver and unclean hands bar Panache from recovery for any breach on plaintiff's part.[1]
Breach — rent and additional rent
With regard to the issue of the breach of the lease by non payment of rent it is settled law that where a tenant breaches a lease the landlord may either continue the tenancy and sue the tenant for the unpaid rent under the lease or may terminate the lease and sue for the resulting damages as in any contract action. ROKALOR, INC v. CONNECTICUT EATING ENTERPRISES, INC., 18 Conn. App. 384, 388 (1989). In the former instance the landlord may recover the full amount of the rent without any obligation to mitigate damages. DEWART BUILDING PARTNERSHIP v. UNION TRUST CO. 4 Conn. App. 683, 687
(1985). In the latter instance the landlord cannot recover the unpaid rent as such because he has terminated the lease CT Page 2888 thereby releasing the tenant from any obligation to pay rent. Nevertheless, he is entitled to recover damages for breach of contract. ROKALOR, INC, supra 389.
This in essence is what occurred in the case at bar. Panache failed to pay the rent pursuant to the lease, plaintiff exercised its option to terminate the lease by service of a notice to quit and brought suit to recover the unpaid rent which accrued prior to the termination and also to recover damages sustained by the plaintiff after the termination as measured by the rent plaintiff would have collected had the defendant fully performed the lease. LAR-ROB BUS CORPORATION v. FAIRFIELD, 170 Conn. 397, 404-405
(1976) Therefore, if Panache breached the lease, the plaintiff may recover both unpaid "rent" accruing prior to July 15, 1987 as well as future provable damages accruing after July 15, 1987 subject only to any valid defenses, set-offs or counter claims properly established by Panache. In addition, the plaintiff may recover against Polayes on the lease guaranty again subject to the same limitations. 38 AM JUR 2d, Guaranty, sec 74, p. 1077.
Material breach
The following discussion disposes of the claims of breach as it relates to both parties.
Panache concedes that it did not pay the rent as stipulated in the lease. This would entitle the plaintiff to recover unless defendants can justify such conduct. In this regard the defendants claim Panache was relieved from paying rent because plaintiff breached the lease by failing to deliver possession of the agreed upon retail and storage space. Defendants reason that this was a material breach and thereby voids the lease and precludes the plaintiff from recovering any back rent or damages but rather entitles Panache to damages. The court disagrees.
A breach is not material where the object of the lease would be satisfied without substantial variance from what was contemplated by the parties. HARTFORD ELECTRIC APPLICATIONS OF THERMALUX, INC v. ALDEU, 169 Conn. 177, 184 (1935)
Pursuant to paragraph 1 of the lease the plaintiff agreed to deliver and the defendant agreed to accept 3000 s/f more or less of retail space on the first floor of the demised premises. As measured t)y the plaintiff's architect and acknowledged by Polayes [R-28], Panache received 2,735 s/f on the first floor exclusive of common areas. Assuming arguendo that these figures are absolute, the defendant CT Page 2889 therefore received 265 s/f or 8.8% s/f less than 3,000 s/f.
In the case at bar there is no evidence in the record that the lack of 265 s/f was a substantial variance from what the parties contemplated. Put differently, the 8.8% of retail space that the plaintiff failed to deliver was not a critical factor in the intended use of the premises and therefore did not constitute a material breach. M. SHAPIRO SON CONSTRUCTION CO v. BATTAGLIA, 138 C 238, 246 (1951). This reasoning assumes that the agreement discussed absolute figures which, of course, it did not. The square footage recited in the agreement was only an approximation. Obviously, this was because during the time the lease was being negotiated the subject premises were under major renovation and subject to changes. The interior of the first floor had been gutted and there was a large hole in the floor and the basement was a large dirt pit. Because of these conditions exact measurements were not feasible. Nevertheless, both parties had a general understanding of defendant's space requirements. Suffice it to say that each party contemplated delivering and receiving approximately 3,000 s/f of retail space.
Consequently, since the defendant contemplated only approximation of the spatial quantity to be delivered and since the smaller amount of space actually delivered did not impose any substantial interference to the defendant in its use of the retail space, the delivery of 2,735 s/f instead of approximately 3,000 s/f did not constitute a material breach of the agreement so as to void the agreement and relieve the defendant from paying rent.[1]
Panache next claims that the plaintiff misrepresented the square footage of the retail space resulting in a disproportionately higher charge for additional rent. Panache claims this also justified it in withholding rent. The court need not address the validity of this theory because it finds there was no misrepresentation.
For purposes of calculating the amount of additional rent, the Court concludes that there was no dimunition of space. Based on the measurements of the plaintiff's architect, the 1st floor (retail space) consisted of 2,735 s/f exclusive of common areas. The architect further testified that the entire building contained some 13,060 s/f also exclusive of common areas. [R-15] The court accepts the accuracy of this testimony. Paragraph 2(a) of the lease recited that the parties agreed that the lessee's floor space represented 20% of the total retail space of the entire building for purposes of determining defendant's share of CT Page 2890 additional rent. 20% of 13,060 = 2,612 s/f or 123 s/f less than the defendant actually received. Put another way, based on these calculations, defendant's floor space represented almost 21% of the floor space of the entire building — exclusive of common areas. Consequently, the plaintiff did not misrepresent the size of the retail space nor was the defendant overcharged for additional rent based on the formula agreed upon for the computation of said rent. On the contrary, if anything, the defendant was undercharged. Accordingly, Panache cannot prevail on its 5th special defense.
Cellar Storage Space
Now, with regard to the plaintiff's failure to deliver the agreed upon cellar space, the court has already concluded that the agreed upon storage space was to be 833 s/f supra. Therefore if the plaintiff failed to provide this storage space, based upon the rules of law already stated, such failure would constitute a material breach as storage space was critical to the operation of the defendant's business. See M. SHAPIRO SON CONSTRUCTION CO v. BATTAGLIA, supra. Since the plaintiff never delivered the agreed upon storage space to the defendant the plaintiff is guilty of breaching the agreement.
However, the plaintiff claims that Panache is either estopped from asserting this breach or has waived it by accepting alternate storage space for the entire period during which it occupied the premises under the lease.
Estoppel
Equitable estoppel rests on the misleading conduct of one party to the prejudice of the other. The party against whom the estoppel is asserted must do or say something intended or calculated to induce the other to change his position, and the other party must change his position in reliance thereon to his prejudice. NOVELLA v. HARTFORD ACCIDENT INDEMNITY CO., 163 Conn. 552, 563 (1972) Furthermore, there must generally be some intended deception in the conduct or declarations of the party to be estopped. NOVELLA, supra 564. BLAND v. BREGMON, 123 Conn. 61, 65 (1937)
In the case at bar it was the plaintiff, not the defendant, who offered the alternate space. Therefore it was the plaintiff who induced the party against whom the estoppel is asserted to change his position and take the and floor space. Furthermore, there is nothing in the record to support the conclusion that the defendant accepted this CT Page 2891 arrangement with any intent to mislead or deceive the plaintiff. At the time of this offer and acceptance neither party desired to terminate the relationship. To the contrary, this arrangement was struck in order to preserve the relationship. It is therefore obvious that the essential elements of an estoppel are not present in this case. Consequently, plaintiff cannot prevail on an estoppel theory.
Waiver
The result is different with respect to the claim of waiver. Waiver is the intentional relinquishment of a known right. NOVELLA, supra, 561; NATIONAL TRANSPORTATION CO. v. TOQUET, 123 Conn. 468, 475 (1937). To constitute a waiver there must be both knowledge of the existence of the right and an intention to relinquish it. Furthermore, waiver involves the idea of assent. Assent is an act of understanding. NOVELLA, supra 562 citing MACKAY v. AETNA LIFE INS CO, 118 Conn. 538, 547 (1937).
In the case at bar it is clear from the record that the defendant assented to occupying alternate storage space on the 2nd floor until such time as the agreed upon cellar space was ready for occupancy. Furthermore, Panache's right to insist upon prompt delivery of the cellar space was expressly waived by its "protest" letter of Nov. 28, 1986, in which the defendant acknowledged the delivery of the 2nd floor space as being ". . . temporarily provided in lieu of basement space . . . " [emphasis added] until ". . . completion of all construction. . . ." [Ex 17] The defendant thereby expressly waived its right to immediate possession of the cellar space, while reserving its right to ultimate possession thereof when all construction had been completed. However, since the record does not indicate that renovations to the cellar space were ever completed during the abbreviated term of the lease, the court concludes that for all practical purposes the defendant relinquished its right to receive the cellar space in question by accepting and occupying alternate space, but only for this abbreviated period. NOVELLA, supra. For the reasons already stated the defendant cannot prevail on its counter claim alleging breach nor on its first special defense. Inasmuch as this is dispositive of the defendant's claim of breach, it is unnecessary to consider the plaintiff's other defense of unclean hands.
Fraud in the Inducement
In the 4th Count of its counter claim Panache alleges that it was fraudulently induced to enter into the lease by Mark Koffman's representations that a restaurant operated by CT Page 2892 him in the same building complex would remain open during the term of the lease. Polayes claims to have been induced to enter into the lease on the strength of this representation to his detriment. This claim is totally without merit.
There is absolutely no credible evidence in the record to support either that such a representation was made or, if made, that it induced Polayes to enter into the lease. There is merely Polayes' bare assertion of same. It should be noted here that throughout the negotiations that preceded the signing of the lease both parties were represented by attorneys. There were multiple drafts prepared before the terms were finalized. Polayes and his attorney reviewed the final document before signing it. Moreover, the terms of the lease belie this claim.
Paragraph 34(e) of that document expressly provided:
 ". . . no representation, inducement, understanding or anything of any nature whatsoever made, stated or represented on the Lessor's behalf, either orally or in writing. . . has induced Lessee to enter into this lease."
Finally, Jonathan Polayes, although not a lawyer, was fully conversant with all of the terms of the lease and their general legal import as evidenced by his testimony and demeanor in the court room during the course of this trial. There is no question in this court's mind that if Polayes was induced to enter into this lease by any such representation of the import now assigned to it, the abovementioned provision would not have escaped his scrutiny or passed his muster.
Return of Security Deposit
Inasmuch as the court has concluded that Panache was in default of the lease by, inter alia, failing to pay the stipulated rent, its claim for the return of its security deposit must also fail. At the time the lease and guaranty agreement was executed the Panache delivered 2 month's security deposit plus one month's base rent in advance for a total of $41,100. [R-49] The advance rent was credited to Panache for the December, 1986 base rent. Subsequently, Panache unilaterally applied $7,400 of the remaining $27,400 security deposit toward the payment of the May, 1987 basic rent [Ex O n. 1] leaving a balance of $20,000. The security was never replenished and when Panache vacated the balance of the security deposit was not returned.
Under normal circumstances the defendant would be CT Page 2893 entitled to the return of this $20,000 upon vacating. However, paragraph 30 of the lease permits the landlord to apply the security deposit ". . . toward the reduction of damages. . ." in the event of the tenant's default. For the reasons already expressed Panache is not entitled to the return of the security but merely entitled to have it credited to any damages it may be responsible for.
Mitigation of Damages
Panache's 6th special defense claims that the plaintiff failed to mitigate its damages because it evicted the replacement tenant prematurely before all damages could be recouped. Although the landlord has a duty to mitigate its damages, that duty does not require the landlord to sacrifice any substantial right of its own, or to exalt the interests of the tenant above its own. ROKALOR, INC., supra, 389. All that is required is that the landlord make reasonable efforts to minimize damages. DANPAR ASSOCIATES v. SOMERSVILLE MILLS SALES ROOM, INC., 182 Conn. 444, 446 (1980)
Under the facts of this case the defendant cannot prevail on this claim. The new tenant, Port Side did take over the defendants space in addition to other space in the building which had the potential effect of completely wiping out all damages (for "future rent") sustained by the plaintiff as a result of the defendant's breach. However, approximately 8 months into the lease Port Side defaulted in the payment of rent after about 3 months of unsuccessful attempts to collect back rent, the plaintiff locked Port Side out of the premises and effectively terminated that lease. Although the court does not condone the plaintiff's method in terminating that leases it does conclude that under the circumstances it could not reasonably anticipate that Port Side, Inc. would continue to pay rent and was therefore justified in its decision to terminate the Port Side lease. Plaintiff was not obliged to continue indefinitely a nonpaying tenant or a tenant who could not pay the fair rental value of the premises solely for the benefit of the defendant. ROKALOR, INC., Id. Furthermore, after the eviction of Port Side, plaintiff continued to make bona fide efforts to fill the defendant's space with other tenants but was unsuccessful in acquiring any. Consequently, the court concludes that the plaintiff did make reasonable efforts to mitigate its damages and is not thereby precluded from recovering the full measure of its damages. The defendants 6th special defense must therefore fail.[1]
Operating Expenses CT Page 2894
Under paragraph 2(b) of the lease the defendant was to pay as additional rent its pro rata share of the operating expenses of the entire building complex. These were expressed in sub-paragraphs 1 through 5 of paragraph 2(b). In addition, an exhibit was attached to the lease entitled "Summary for Additional Rent", [Ex A] the purpose of which was to demonstrate the nature and extent of the typical operating expenses referred to in paragraph 2(b) of the lease. [R-__] Also paragraph 2(c) of the lease made it clear that "operating expense of every kind were intended to be included so that the base rent was to represent a net return to the landlord.
The various items which plaintiff claims comprise the "operating expenses" and for which Panache was billed for its pro rata share is depicted in Exhibit I and entitled: "Calculation of Additional Rent for Calendar Year" and there follows a sheet for each year from 1987 through 1990. With the exception of the "management fees" and "Professional (Legal Accounting Architecture)" the court concludes that the items set forth in these documents accurately reflect the operating expense referred to in the lease agreement and attachment and in fact represented expenses incurred by the plaintiff.
With respect to the item designated "management fees" it appears from the testimony that this was a fee paid to the lessor; that it is based solely on the amount of gross rentals collected in any one year having no relationship whatsoever to the performance of any service. Furthermore, there is no evidence in the record to indicate what, if any, management services the lessor performed. Under these circumstances this amounts to nothing more than another form of base rent to the lessor — not an expense of operating the building. Because of the nature and amount of this item and because this item did not appear on the "Summary for Additional Rent" nor anywhere else in the lease, it is difficult for the court to believe that the parties contemplated that this would be included either as a component of basic rent or as a component of additional rent. For these reasons the court concludes that this "management fee" was not an "operating expense" within the meaning of the lease and therefore plaintiff may not recover for it as "additional rent" under the lease.
With regard to the item entitled "Professional (Legal Accounting Architecture)", it is difficult to understand how architectural services would be involved in operating the affairs of the building. This item like the management fees item is not found anywhere in the lease documents. CT Page 2895 Additional Rent was a common charge imposed on all tenants according to the amount of space they occupied in the building. In addition to the fact that there is no evidence in the record to substantiate plaintiff's expenses for this item, the available evidence does not support the claim that this was contemplated by the parties to be an "operating expense" or part of the "Additional rent" which the tenant was obliged to pay under the lease. Accordingly, the court concludes that the plaintiff has failed to prove its claim for management fees and professional expenses and they must therefore be deleted from Koffman's computations of additional rent. [See Exhibit A attached hereto for illustration of Court's Recalculation of operating expenses.
Damages — Rent Additional Rent
Damages based on "rent" and or "additional rent" in this case may be divided into three categories: damages for back rent during the lease period; damages for use and occupancy for the period defendant occupied the premises after termination; and, damages for losses sustained by reason of the breach from the date Panache vacated the premises to the date of judgement. Each category of damages is measured differently.
During the period the lease was in effect the determination of damages is straight forward, i.e., the amount of the unpaid rent. ROKALOR, INC., supra, 391-392. However, once the landlord terminates the lease prior to its normal termination date, the measure of damages is not the amount of the unpaid rent for the balance of the lease, but his actual loss sustained as a result of the breach. LAB-ROB BUS CORPORATION v. FAIRFIELD, supra.; ROKALOR, INC. supra. 389. This loss of course may be determined by the amount of rent due on the balance of the lease so long as it accurately measures the landlord's loss. Consequently, rent due for the balance of the lease term might well be a factor to be considered in determining the landlord's actual loss. ROKALOR, INC. Id. Also to be considered is to what extent, if any, the landlord mitigated his damages. ROKALOR, INC. supra. 390; DANPAR ASSOCIATES, supra. 446. Then there is the situation where the tenant does not vacate the premises immediately after the lease is terminated. In that event the status of the tenant changes from a periodic tenancy to one at sufferance. O'BRIEN PROPERTIES, INC. v. RODRIGUEZ, 215 Conn. 367,372 (1990); HOUSING AUTHORITY v. HIRD, 13 Conn. App. 150,157 (1988) It is well settled that a landlord is not entitled to recover "rent" from a tenant at sufferance, but is merely entitled to recover "use and occupancy". Therefore damages during this period is measured by the fair rental CT Page 2896 value of the property. LONERGRAN v. CONNECTICUT FOOD STORE, INC., 168 Conn. 122, 130-131 (1975)
Period Prior to Termination
It is uncontroverted that Panache occupied the premises under the lease from late November, 1986 through July 15, 1987. Although the lease commenced by its terms on October 1, 1986, Panache's obligation to pay rent did not commence until December 1, 1986 by agreement. [Ex A, para. 21] Thereafter until July, 1987 Panache made only partial payments and, in some instances, no payments on account of monthly rent. According to the plaintiff as of July 1, 1987 Panache had accumulated an arrearage of $27,742 in basic rent and $12,272.53 in additional rent plus late charges [see Ex J. O][1] Taking into consideration the court's recalculation of operating expenses, the court concludes the plaintiff has sustained damages in the amount of $27,842.00, representing unpaid basic rent from Jan 1, 1987 through July 15, 1987; and, damages in the amount of $12,689.22, representing the unpaid "additional" rent from December 1, 1986 through July 15, 1987 together with interest thereon to the date of judgement. [See Exhibit B hereto]
During Tenancy at Sufferance
It is also uncontroverted that plaintiff served Panache with a notice to quit on July 15, 1987. [Ex 15] This had the effect, inter alia, of converting the periodic tenancy arising out of the lease to a tenancy at sufferance. O'BRIEN PROPERTIES, supra., 372; HOUSING AUTHORITY v. HIRD, supra., 157. The defendant remained in possession of the premises in this status from July 16, 1987 through March 10, 1988. During this time the defendant did not tender any "rent" but did pay over to the plaintiff use and occupancy pursuant to the stipulated judgement obtained in the summary process case. [Ex 15]
Plaintiff, however, seeks to charge the defendant for the difference between the use and occupancy provided for in the stipulated judgement and the "rent" provided for in the lease plus late charges on this difference. . This it cannot do inasmuch as the defendant's only duty under the law is to pay use and occupancy. LONERGRAN v. CONNECTICUT FOOD STORE, INC, supra, 131.[1]
Consequently plaintiff is limited to the recovery of use and occupancy which was established by the stipulated judgement without late charges from August 16, 1987 to April 15, 1988.[1]
[See table in Exhibit B hereto illustrating the above.] CT Page 2897
Posteviction Period
From April 16, 1988 through November, 1988 the premises were relet to Port Side who conducted a restaurant business therein. However, from December 1, 1988 to the date of this judgement the premises were again vacant, Port Side having been evicted for non payment of rent. The plaintiff claims that the proper measure of damages for this period would be that amount of rent and additional rent it would have received under the Panache lease had there been no breach and the lease had run full term to the date of judgement less any credits due the defendant for monies collected from reletting the premises. The plaintiff submits as an illustration of the application of these principles summaries of damages from Jan 1, 1987 to the anticipated date of judgement which calculate the projected amount of the loss plaintiff claims to have sustained. [Exs J, K, O P]
Although the plaintiff correctly states the legal principles governing its recovery of these items of damage, its summaries incorrectly apply these principles to the facts in this case. The plaintiff cannot use the "future" rental payments due under the lease as the equivalent of its loss because they do not fairly reflect that loss. The lease rental was predicated on the assumption that the entire demised premises was usable. In fact, only the retail space was usable. The agreed upon storage space was never made usable. Since Panache never waived its right to that space, plaintiff was obligated to deliver it when it was in condition for occupancy. Since plaintiff has never been in a position to deliver the storage space described in the lease, a fortiori, it has suffered no loss to that extent.
Consequently, the plaintiff actual loss is properly measured only by the value of the space actually delivered to the defendant. Because plaintiff has included both retail and storage space in its damage analysis, that analysis is flawed. In order to establish the proper measure of damages value of the storage space must be determined and deducted from the entire rent. This is the crux of the problem. If the rental were on a square footage basis, then the valuation could be easily accomplished mathematically. However, because rent under this lease is based on a flat rate and there is an important unknown variable involved in such valuation, i.e., storage space and retail space may be valued differently in view of their relative utility, this makes a simple mathematical or intuitive calculation of the value of retail space unfeasible. The solution would seem to be to establish the relative valuation of each type of space by expert opinion. However, no such evidence nor any other evidence CT Page 2898 was offered by the plaintiff to establish the value of the retail space, i.e., the space actually delivered.
Furthermore, the value of the storage space consisting of almost 1/3 of the total demised space represented material missing factor in determining the value of plaintiff's loss if measured in the fashion proposed by the plaintiff. It is the obligation of the plaintiff to prove its damages to a reasonable certainty. 22 AM JUR 2d, DAMAGES sec 484, 902. Therefore, in the absence of any reliable evidence from which the court can infer the value of the retail space with reasonable certainty, the value of the plaintiff's actual loss is left to speculation. In short, although the plaintiff has established its right to damages, it has failed to prove the extent of its loss and therefore cannot recover any damages for the item it designates as "basic rent" from the period Panache vacated to the date of this judgement. 22 AM JUR 2d, DAMAGES, Id.; Cf. ARTHUR DRUG STORES, INC. v. LESLIE REALTY, INC., 142 Conn. 274-275 (1955)
The foregoing reasoning does not, however, apply to the item of damages designated by the plaintiff as "additional rent." That category of rent was based on the proportion of retail space occupied by Panache to the amount of retail space in the entire building. Since retail space was delivered per the lease and the formula for calculating the rent can be applied uniformly to the facts, plaintiff's damages may be easily calculated and therefore proveable to a reasonable certainty. ARTHUR DRUG STORES, INC. v. LESLIE REALTY, INC., Id. For this reason the amount of "additional rent" the plaintiff would have received had the lease run its full term is an accurate measure of its losses under the facts of this case. [See Table in Exhibit B attached hereto for figures illustrating above]
In addition to the abovementioned damages the plaintiff is also entitled to recover legal interest on such damages pursuant to paragraph 34(d) of the lease.
Having disposed of the most significant claims in this case, the court now turns to what it characterizes as the subsidiary claims of the parties.
Alterations
In paragraph 5(c) of the First Count of the complaint plaintiff claims that the defendant altered the premises without its consent in violation of the lease provisions. This claim is without merit inasmuch as the court finds no evidence in the record to support it. CT Page 2899
2nd Floor Waste
This claim concerns the unclean condition that Panache allegedly left the second floor storage space upon vacating. Plaintiff predicates this claim on the provision of the lease that imposes an obligation on the tenant to surrender the demised premises in as good condition as it received them, ordinary wear and tear excepted. [para 4(d)(e)]. Panache however did not occupy the second floor storage space under the lease in question as it was not a part of the premises described in the lease. If the plaintiff is to prevail at all under on this claim it must do so under paragraph 21(b) of the lease.
Paragraph 21(b) of the lease provides in pertinent part:
 "If permission is given to Lessee to . . . occupy premises other than the Demised Premises prior to the date specified as the commencement of the term of this Lease, Lessee covenants and agrees that such occupancy shall be deemed to be under all terms, covenants, conditions, and provisions of this Lease." [Emphasis added]
From a reading of this provision is abundantly clear that it is intended to apply to space occupied before the lease was to take effect and not after. Although possession under the lease was delayed until November, 1986, the lease commenced by its terms on October 1, 1986. [Para 1, Ex A] The record is devoid of any evidence indicating the defendant took possession of the second floor space before October 1st. Therefore paragraph 21(b) is inapplicable. Furthermore, No other basis for recovery has been plead by the plaintiff. Consequently the plaintiff cannot recover for damages caused by Panache to the second floor storage space. If the plaintiff cannot recover from Panache under the lease, a fortiori, it cannot recover from Polayes on the guaranty.
1st Floor Waste
The result is different, however, with respect to the application of paragraph 4(d)(e) to the condition of the first floor of the demised premises. Because this space was included in the lease, plaintiff may properly predicate its recovery on that provision.
Plaintiff claims in its Fifth Count that the defendant left the demised premises in a state of uncleanliness upon CT Page 2900 vacating. The court agrees. In this regard the court finds that Panache did leave an unusual amount of debris at the premises and removed several lighting fixtures without the plaintiff's consent all requiring the plaintiff to restore said premises to a rentable condition. The court concludes the plaintiff sustained $980 in damages for clean-up, carting and replacement of the missing light fixtures. [See Ex B; R-3-4]
Reletting Expenses
In its Second Count the plaintiff seeks recovery for expenses it incurred in reletting the demised premises. Paragraph 16 of the lease provides the basis for such recovery. These expenses concerned the legal fees incurred in negotiating and preparation of the lease with Port Side which expenses are treated elsewhere in this decision. The plaintiff is therefore entitled to recover same.
Next follows a group of allegations which defendants claim excused Panache from paying rent.
Garbage, Maintenance Electricity
Panache claims by way of special defense that the plaintiff failed to provide garbage removal, hot water or maintenance pursuant to the terms of the lease (3rd special defense) and intentionally deprived Panache of electricity (2nd special defense). It is noteworthy that the defendants allege these claims as special defenses.
Whether or not the plaintiff was guilty of these acts. plaintiff's conduct in any of these respects would not constitute a valid defense to a covenant to pay rent both under the provisions of the lease and under the common law. Paragraph one of the lease requires the payment of rent thereunder ". . . without demand or set off or deductions of any kind. . . ." It is well settled law that with the exception of conditions that render the premises uninhabitable, the covenant to pay rent is considered independent of other covenants in the lease. IN RE EDGEWOOD PARK JUNIOR COLLEGE, INC., 123 Conn. 74, 78-79 (1937); AMSTERDAM REALTY CO v JOHNSON, 115 Conn. 243, 248 (1932); S.H.V.C., INC. v. ROY,37 Conn. Sup. 579, 585 (1951) Therefore the landlord's breach of other covenants in a lease will not relieve the tenant from his obligation to pay rent. Furthermore, there is no evidence in the record that any of the conditions complained of rose to the level of rendering the premises uninhabitable. And, with respect to the electricity claim, there is evidence that even after the shut down of the electricity, the CT Page 2901 defendant conducted business as usual for the duration of the shut down period. Therefore, since the claims as plead do not justify the withholding of rent, defendant cannot prevail on special defenses 2 and 3.
Electricity Disruption
Also in regard to the electrical service, Panache claims in the 3rd count of its counter claim that the plaintiff maliciously caused disruption of the electrical service to the demised premises on July 16, 1987 for a period of about 2 weeks all in violation of sec 19a-109 CGS and the terms of the lease.
Section 19a-109 provided in pertinent part:
 "* * * The owner of any building . . . or any lessor . . . of any building, or any part thereof, the lease or rental agreement whereof by its terms, express or implied, requires the furnishing of . . . electricity . . . to any occupant of such building or any part thereof, who, wilfully, and intentionally, fails to furnish such . . . electricity . . . and thereby interferes with the comfortable or quiet enjoyment of the premises . . . shall be fined not more than $100 or imprisoned not more than 60 days or both. * * *" [emphasis added]
Panache claims that the violation of this statute entitles it not only to an abatement in the rent for the period it was without electrical service but also consequential damages including the loss of business and legal expenses incurred in restoring service.
Assuming arguendo that Koffman was responsible for disrupting Panache's electrical service, Panache's reliance on this statute is misconceived. The statute is predicated on the landlord's contractural duty to provide electric service to the tenant. Paragraph 9(a) of the lease [Ex A] makes the tenant, not the landlord, responsible for acquiring and paying for electrical service to the demised premises unless the landlord elects to do so. There is no evidence in the record that Koffman assumed this responsibility. Moreover, there is evidence that Panache never made such arrangements and became delinquent in the payment of electrical bills for such service that was provided under the landlords name. This despite repeated requests by the landlord for Panache to make the necessary arrangements for the change in billing.
But even assuming there was some responsibility on the CT Page 2902 part of the landlord under paragraph 9(a) of the lease, Panache's claim thereunder must nevertheless fail. Electrical service was disrupted in July 16, 1987. Panache's lease was terminated on July 15, 1987. Therefore, on the day service was disrupted there was no lease or rental agreement in existence. After a lease has been terminated the landlord no longer has any legal duty to discharge his obligations thereunder. ROKALOR, INC., supra 391-92.
Panache also alleges that this disruption is a "breach of Koffman's leasehold . . . duties". This theory of recovery is not further explained or developed either in the pleadings or in the proof. The only explanation the court is able to find is contained in defendants' Trial Brief (Third Count) and defendant's Post Trial Memo (para 10) in which it appears to predicate this leasehold duty on paragraph 17(b) of the lease. For the lack of any further development of this theory the court must conclude that this is the only other basis on which Panache predicates its claim under this count of its counter claim.[1]
Paragraph 17(b) of the lease concerns rent abatement in the event the premises became temporarily untenantable due too "fire, explosion, the elements or otherwise." [Para 17(a)] It is obvious that this provision is not applicable to the instant situation because it is equally obvious and the court specifically finds that the disruption in the electrical service was not due to some destructive force. Finally, because this claim is predicated on a provision in the lease, it suffers from the same disability as the statutory claim, to wit: there was no lease in existence at the time the cause of action arose. ROKALOR, INC., supra.
Accordingly, for all of the foregoing reasons, the defendant cannot prevail on the Third Count of its counter claim.
While on the subject of electrical service it should be noted that the plaintiff also makes a claim for reimbursement for the cost of electrical service provided to Panache while the electrical meters were still in Koffman's name. This claim is easily disposed of as the court can find no evidence in the record that the plaintiff was obliged to pay, or did pay for any part of Panache's electrical service.
Unjust Enrichment/Quantum Meruit
The plaintiff claims in its Fourth Count that it is entitled to be paid the reasonable value of the fit-up work it performed at the request of the defendant. This amounts CT Page 2903 to a claim for unjust enrichment.
Unjust enrichment and quantum meruit are forms of the equitable remedy of restitution by which a plaintiff may recover the benefit conferred on a defendant in situations where no express contract has been entered into. In order to recover it must be shown that the defendant knowingly accepted the services of the plaintiff and represented that plaintiff would be compensated therefore without agreeing on the price or value. Further, it must be shown that the defendant was benefited, that the benefit was unjust in that it was not paid for by the defendant and that the failure of payment operated to the detriment of the plaintiff. If such is shown, the plaintiff is entitled to recover the reasonable value of the services. BURNS v. KOELLMER, 11 Conn. App. 375,383-385. (1987)
The court finds that the plaintiff did perform certain construction or fit-up work in the demised premises beyond the scope of work required of it by Schedule B. This work included the extension of a sales counter, installation of "T" walls and wiring of certain lighting fixtures. With regard to the last item, the court specifically finds that the plaintiff's responsibility with respect to wiring in the demised premises extended only to perimeter wiring and not the connection of the lighting fixtures to the perimeter wiring. However the court finds that Koffman's testimony regarding the details of such work too vague and uncertain as to clearly distinguish it from work the plaintiff was performing on the premises. Likewise, Koffman was unable to sufficiently distinguish the supportive evidence (bills) for the work claimed from those for other work and materials unrelated to the subject premises. [See Ex F and attachments, R-2, 6, 8, 9] The resulting confusion merely emphasizes plaintiff's failure to meet its burden of proof on this issue. Consequently, the plaintiff cannot recover any damages claimed in the Fourth Count for the work performed. 22 AM JUR 2d, DAMAGES, supra.
A similar infirmity exists with regard to Panache's claim for reimbursement for the cost of fit-up work it performed which it claims was plaintiff's responsibility under Schedule B.
Polayes testified to performing framing, sheet rocking and taping of walls on the first floor of the demised premises during October and November of 1986. It is unclear from the record whether the defendant's undertaking resulted from the plaintiff's refusal to complete the work or because the defendant became impatient with the pace of plaintiff's CT Page 2904 efforts. If the latter, it would not constitute an unjust enrichment because rather than conferring an benefit upon the plaintiff, it would constitute an interference with the plaintiff's ability to perform its duties under the contract. Obviously, there could be no recovery under the theory pleaded. If the former, it would indeed confer a benefit upon the plaintiff and thereby entitle Panache to the reasonable value of the work performed. BURNS v. KOELLMER, supra.
The record, however, is also deficient in establishing whether the work performed by the defendant was work on the perimeter walls, which the court has concluded was the responsibility of the plaintiff or work performed on the interior walls which would have been the responsibility of the defendant. Obviously, if the latter, the defendant could not recover for same.
For the foregoing reasons the Panache has failed to carry its burden of proving this claim. Accordingly, Panache cannot prevail on the sixth count of its counter claim.
Attorney's Fees
Finally, both parties claim they are entitled to attorneys fees pursuant to paragraph 16 and 34(d) of the lease. The plaintiff seeks recovery of attorneys fees in association with the enforcement of defendants' obligations under the lease including the institution of an eviction action to regain possession of the subject premises, the institution of the instant action and in connection with the reletting of the subject premises and in defense of defendants counter claims. Panache seeks to recover its legal expenses for the successful defense of the instant action as well as the successful prosecution of its counter claim.
Where parties to a contract agree that the non-breaching party is entitled to reasonable attorneys fees, the breaching party may recover the contractually imposed legal expenses. BUSHNELL PLAZA DEVELOPMENT CORPORATION v. FAZZANO, 38 Conn. Sup. 683,687 (1983). The lease in question provides that either party may recover legal expenses from the defaulting party. Ex A, 34(d).
Plaintiff's Attorney's Fees
Inasmuch as the court finds that the plaintiff has successfully prosecuted its claims in the instant action and successfully defended the counter claim, it is entitled to CT Page 2905 recover its legal expenses therefore. BUSHNELL PLAZA DEVELOPMENT CORPORATION v. FAZZANO, supra; Ex A para 34(d). For the same reason it may also recover its legal expenses incurred in the successful prosecution of the summary process action (see Ex 15). Finally, plaintiff may recover legal expenses incurred to relet the premises pursuant to paragraph 16 of the lease in the amount of $1,500. The plaintiff has presented bills for legal services in connection with the abovementioned items which are uncontroverted. In view of the complexity of this case, the extra briefing required by the attorneys and the time consumed in preparation and at trial, the court concludes that the amount of the uncontroverted legal fees are fair and reasonable. The court therefore finds the plaintiff is entitled to recover of the defendants in the amount of $65,325.00, representing legal expenses incurred through October 23, 1991. [Exhibits P, NN and plaintiff's final "Summary of Damage Claim".]
Defendants' Attorney's Fees
The defendant Panache has not prevailed in the primary action brought by the plaintiff nor on its counter claim. Therefore it cannot recover any attorney's fees incurred in connection with the instant action.
For all of the foregoing reasons judgement in this matter may enter in favor of the plaintiff as more particularly set forth in the "Judgment Form" attached hereto.
BY THE COURT, MELVILLE, J.
JUDGEMENT
In the above captioned matter the court finds:
On the FIRST COUNT of the complaint for the PLAINTIFF and against the DEFENDANT, Panache Plus, Inc in the amount of. . . . . . . . . . . . . . . .$150,940.09
On the SECOND COUNT of the complaint for the PLAINTIFF and against the DEFENDANT, Panache Plus, Inc in the amount of. . . . . . . . . . . . . . . .$1,500.00
On the THIRD COUNT of the complaint for the PLAINTIFF and against the DEFENDANT, Jonathan Polayes in the amount of. . . . . . . . . . . . . . . .$153,420.09
On the FOURTH COUNT of the complaint for BOTH DEFENDANTS CT Page 2906 and against the PLAINTIFF, Koffman Associates, Ltd.
On the FIFTH COUNT of the complaint for the PLAINTIFF and against the DEFENDANT, Panache Plus, Inc in the amount of. . . . . . . . . . . . . . . . .$980.00
AND on the COUNTER CLAIM for the PLAINTIFF and against BOTH DEFENDANTS on all counts.
[See Exhibits A, B, C attached hereto which illustrate in detail how the above amounts were computed.]
BY THE COURT, MELVILLE, J.
 KOFFMAN ASSOCIATES, LTD v. PANACHE PLUS, INC., ET AL. CVNO. 8707-987
CT Page 2907
EXHIBIT A
Recalculation of Operating Expenses
Item 1987 1988 1989
Property Taxes $15,976.96 23,312.26 25,906.43 Insurance 54,462.00 18,989.44 12,000.00 Utilities 16,261.29 14,805.64 11,508.17 Clean/Maintenance 10,192.00 3,000.00 -0-
TOTALS $96,892.25 60,107.34 49,414.60
20% = 19,378.45 12,041.47 9,882.92
Monthly 1,614.87 1,001.79 823.58
1990
Property Taxes $25,906.43 Insurance 12,000.00 Utilities 3,940.00 Clean/Maintenance -0-
TOTALS $41,846.43
20% = 8,369.29
Monthly 697.44
*[EXHIBIT B IS NON-TRANSFERRABLE]
 KOFFMAN ASSOCIATES, LTD v. PANACHE PLUS, INC., ET AL. CVNO. 8707-987
EXHIBIT C
Summary of Damage Award
Amount due for Base Rent: $27,742.00 (from 1/1/87 — 7/30/87)
Amount due for Use Occupancy: 121,600.00 (from 8/1/87 — 8/15/88)
10% Interest on Base Rent: 9,669.34 (from 1/1/87 — 10/31/90)
Amount due for Additional Rent: 12,689.22 (from 12/1/86 — 7/30/87) CT Page 2908
Damages on account of Add'l Rent: 24,262.98 (from 8/1/87 — 10/31/90)
10% Interest on Add'l Rent: 8.070.55 (from 12/1/86 — 10/31/90)
Amount due for Attorneys Fees: 65,325.00
Amount due for Reletting 1,500.00 (attorney's fees)
Amount due for Clean-up 980.00
TOTAL GROSS AWARD $271,839.09
LESS CREDITS FOR:
 Use Occupancy Payments: 98,419.00 (per judgement)
Security Deposit 20,000.00
TOTAL CREDITS (118,419.00)
TOTAL NET AWARD $153,420.09